IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANDRE BAILEY | CRIMINAL ACTION<br><br>No. 23-498-KSM |

MEMORANDUM

**MARSTON, J.**                                                                                          November 27, 2024

      *Pro se* Defendant Andre Bailey faces federal charges for unlawfully possessing a firearm, in violation of 18 U.S.C § 922(g)(1), and for possessing an unregistered firearm, in violation of 26 U.S.C § 5861(d). (Doc. No. 1 at 1–2.) Bailey now moves to suppress evidence recovered in the search of his car and DNA evidence. (Doc. No. 59 at 1–3; Doc. No. 66 at 1; Doc. No. 83 at 1.) This Court held an evidentiary hearing on Bailey's motion to suppress on November 20, 2024. During the hearing, Philadelphia Police Department Officer Brad Momme and Detective William Lackman testified. (Rough Hr'g. Tr. at 2.) The Government also introduced body camera footage from Officer Momme. (*Id.* at 16:15–17:2.) For the reasons stated below, the Court denies Bailey's motion to suppress.

**I.**     **Factual Background**

      Officer Momme was on patrol working the 6:00 p.m. to 2:00 a.m. shift in northwest Philadelphia on May 31, 2023. (*Id.* at 13:1–14:15.) Officer Momme was working alone in a marked police car. (*Id.* at 13:20–14:1.) At around 10:00 p.m., Officer Momme saw a blue minivan drive by with only one working headlight and one working brake light.[1] (*Id.* at 15:24–

---

[1] Officer Momme also testified that the minivan's "high beams [were] on." (Rough Hr'g. Tr. at 16:3–5.) This testimony is consistent with his interview with Detective Lackman on the night of the traffic stop. (*See* Doc. No. 94 at 15.)

16:6.) As the car went past him, he also noticed a custom paper tag where the license plate should have been. (*Id.* at 16:6–10.) Because of the broken headlight, brake light, and missing valid license plate, Officer Momme activated his lights and sirens and pulled over the minivan. (*Id.* at 16:12–14.)

The driver of the minivan—later identified as Andre Bailey—pulled over. (*Id.*) Officer Momme exited his vehicle and walked up to the driver's side door. (*Id.* at 17:11–17.) As he did so, he noticed that the minivan had heavily tinted windows. (*Id.* at 19:15–17.) When he got to the driver's door, Bailey rolled down his window a few inches. (*Id.* at 17:15–17.) Through a three- to four-inch gap, Officer Momme could see that Bailey had on a bullet proof vest, and he saw what appeared to be an AR-15 on the front passenger seat. (*Id.* at 17:18–21.) Officer Momme told Bailey that he saw a firearm, but Bailey responded that it was just a toy. (*Id.* at 17:24–18:3.) Officer Momme said he was treating it as a real firearm and asked Bailey to turn off the vehicle and keep his hands on the steering wheel. (*Id.* at 19:6–10.) Bailey refused and sped away. (*Id.*)

Officer Momme attempted to chase the minivan, but lost sight of it.[2] About twenty minutes later, Officer Momme located the same minivan, unoccupied and parked on the side of the road.[3] (*Id.* at 20:13–18.) Officer Momme looked inside the car and spotted the bullet proof

---

[2] This fact was shown in the Government's Exhibit 1, which was the body camera footage of Officer Momme from the night of May 31, 2023. (*See* Rough Hr'g. Tr. at 16:15–17:3.) The footage also showed that Officer Momme had reported that the car was a Honda Odyssey at first, but he later learned that it was a Nissan Quest. (*Id.* at 20:5–10.)

[3] When Officer Momme discovered the blue minivan, he observed that its rear bumper was resting on the front bumper of a red Chevrolet Tahoe. (Doc. No. 94 at 12.) The Tahoe had the same custom paper tag as the blue minivan. (*Id.*) Officer Momme observed a rifle in the back seat of the Tahoe, and detectives also obtained a search warrant for this vehicle. (*Id.*) Bailey was not charged with possession of the firearm seized from the Tahoe, and it is not subject to the suppression motion pending before the Court.

vest that Bailey was wearing during the traffic stop. (*Id.* at 20:19–23.) Officer Momme ran the minivan's vehicle identification number and discovered that the car was last registered to Andre Bailey.[4] (*Id.* at 21:7–19.) Upon a closer look inside the vehicle, Officer Momme also saw what he believed to be a firearm.[5] (*Id.* at 39:3–8.) Additional officers arrived at the scene, and the minivan was subsequently towed to a police lot. (*Id.* at 46:16–22.) Officer Momme learned later that Bailey was not licensed to carry firearms. (*Id.* at 22:3–9.)

Later that night, Detective Lackman took Officer Momme's statement and applied for a search warrant of the minivan.[6] (*Id.* at 44:8–10, 52:11–13, 53:9–11.) A state magistrate judge issued the warrant on June 1, 2023. (*Id.* at 54:2–6.) The detectives executed the search warrant the same day. (*Id.* at 55:18–23.) During the search, law enforcement recovered: (1) an Aero Precision M5 rifle, serial #US201757, loaded with 25 rounds of ammunition; (2) a FGC 9 short barrel rifle,[7] with no serial number, loaded with 28 9mm rounds, and a second magazine

---

[4] Officer Momme testified that the car's registration was expired, but the vehicle identification number listed Andre Bailey as the last registered owner. (*Id.* at 21:11–19.)

[5] Officer Momme testified during the suppression hearing that he had seen two firearms in plain view in the parked minivan. (Rough Hr'g. Tr. at 20:21–23; 39:3–8.) In his interview with Detective Lackman on the night in question, however, he said he had observed only one firearm in plain view in Bailey's car. (Doc. No. 94 at 14.) In the affidavit of probable cause, Detective Lackman also reported that Officer Momme had seen only one firearm in the minivan. (*Id.* at 12.) For purposes of the analysis in Section II.B, the Court analyzes the magistrate judge's probable-cause determination based on the facts set forth in the affidavit of probable cause. Plus, despite this inconsistency, the Court finds that Officer Momme's testimony that he saw at least one firearm in plain view in the minivan was credible.

[6] During the suppression hearing, Bailey questioned Officer Momme about how Officer Momme described what was said during the traffic stop. He cross-examined Officer Momme with two documents: (1) Officer Momme's interview with Detective Lackman and (2) a Preliminary Hearing transcript in state court. (Rough Hr'g. Tr. at 33:6–36:3; Doc. No. 94 at 14–16; Def. Ex. 2 at 45:10–14.) In both documents, Officer Momme stated that Bailey had said he did not want to answer any questions during the traffic stop. (*Id.* at 35:15–36:3; Doc. No. 94 at 15; Def. Ex. 2 at 45:10–14.) Although Bailey is correct that Officer Momme did not relay exactly what was said, after reviewing the Officer's body camera footage of the stop, the Court find that this summary of their interaction was largely accurate.

[7] The FGC 9 short barrel rifle is a semi-automatic firearm. The "FGC-9 is by far the most common" 3D-printed gun in the world. Lizzie Dearden and Thomas Gibbons-Neff, *He's Known as 'Ivan the Troll.' His 3D-Printed Guns Have Gone Viral*, N.Y. Times,

3

containing 21 9mm rounds; (3) an Anderson AM15 .300 caliber rifle, serial #21395505, unloaded; and (4) a work ID, passport, and other paperwork showing Andre Bailey's name or photograph.  (*See id.* at 55:24–56:3; Doc. No. 64 at 1–2; Doc. No. 94 at 11.)

On November 30, 2023, Federal Bureau of Investigation ("FBI") agents obtained a warrant to take a buccal swab of Bailey's inner cheek to get his DNA.  (Doc. No. 111 at 1.)  Agents executed the search warrant on December 13, 2023.  (*Id.*)  After the swab was submitted for DNA typing and comparison, it was determined that Bailey's DNA was on the Aero rifle and the FGC rifle.  (Doc. No. 76 at 3.)

## II. Discussion

Bailey makes several arguments about the traffic stop, the search of his car, and the buccal swab of his cheek.  First, he says that "there was no reasonable articulable suspicion, or a single articulable fact that a crime was committed to perform a traffic stop."  (Doc. No. 59 at 1.)  Second, he argues that the traffic stop violated the Philadelphia Driving Equality Act.  (*Id.*)  Third, Bailey claims that Officer Momme had no "[j]urisdiction to conduct a traffic stop" because Bailey was not engaging in commerce.  (Doc. No. 73 at 1.)  Fourth, he challenges whether the search warrant was supported by probable cause.[8]  Last, he argues that the DNA evidence should be suppressed because his DNA was taken without his consent and by force.  The Court addresses each argument in turn.

### A. The Stop

Bailey provides no argument as to why the Court should disregard the uncontroverted testimony that his car was missing a headlight, brake light, and valid license plate.  Nevertheless,

---

https://www.nytimes.com/2024/09/10/world/europe/ivan-troll-3d-printed-homemade-guns-fgc9.html.

[8] Bailey raised this argument orally at the status conference held on November 14, 2024.

4

he maintains that Officer Momme lacked reasonable suspicion to stop his car. (Doc. No. 59 at 1; Rough Hr'g. Tr. at 89:21–90:9.) So, the Court must determine whether the traffic stop was lawful. It was.

The Fourth Amendment protects people against unreasonable searches and seizures. U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). It is well-established that a traffic stop is a "seizure under the Fourth Amendment." *See, e.g.*, *United States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011) (internal quotations omitted). As the Third Circuit has explained, the Supreme Court created a "bright-line rule that *any technical violation* of a traffic code legitimizes a stop, even if the stop is merely pretext for the investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (emphasis added) (citing *Whren v. United States*, 517 U.S. 806 (1996)).

Here, Officer Momme credibly testified that Bailey had violated several traffic laws before he pulled him over. (*See id.* at 16:3–14.) First, Bailey's car had only one operating headlight, in violation of 75 Pa. Cons. Stat. § 4303(a).[9] Second, Bailey's car had only one operating brake light, in violation of 75 Pa. Cons. Stat. § 4303(b).[10] Last, Bailey's car did not

---

[9] Under 75 Pa. Cons. Stat. § 4303(a), "[e]very vehicle . . . operated on a highway shall be equipped with a head lamp system in conformance with regulations of the department." *Id.* Pennsylvania regulations require "[o]ne lamp shall be located on each side of front of motor vehicle." 67 Pa. Code § 175.66(c)(1). Thus, Bailey's failure to have two operating headlights constituted a violation of 75 Pa. Cons. Stat. § 4303(a).

[10] Under 75 Pa. Cons. Stat. § 4303(b), "[e]very vehicle operated on a highway shall be equipped with a rear lighting system including, but not limited to, rear lamps, rear reflectors, stop lamps and license plate light, in conformance with regulations of the department." *Id.* Pennsylvania regulations require that vehicles "have at least one red stop lamp on each side of rear of vehicle, which shall be illuminated immediately upon application of the service brake." 67 Pa. Code § 175.66(e). So, Bailey's failure to have two operating brake lights constituted a violation of 75 Pa. Cons. Stat. § 4303(b).

properly display a valid registration plate, in violation of 75 Pa. Cons. Stat. § 1332(a).[11]  Because Officer Momme saw Bailey violate several "state traffic regulations," the "traffic stop [was] lawful under the Fourth Amendment."  *United States v. Moorefield,* 111 F.3d 10, 12 (3d Cir. 1997); *United States v. Stewart*, No. 1:07-CR-347, 2008 WL 11349788, at *3 (M.D. Pa. Apr. 18, 2008) (ruling that a traffic stop was constitutional when the officer had observed an "inoperable driver's side headlamp").  Indeed, any one of these traffic violations would have justified the traffic stop.  *Mosley*, 454 F.3d at 252 (explaining that "*any* technical violation of a traffic code legitimizes a stop" (emphasis added)).  Thus, the traffic stop was lawful under the Fourth Amendment.

Bailey resists this conclusion because (1) the stop allegedly violated Philadelphia's Driving Equality Act; and (2) Officer Momme supposedly lacked jurisdiction to pull him over because "you do not need a driver's license, registration or insurance to travel the roadways" unless you are engaging in commerce.  (Doc. No. 59 at 1.)  Neither ground is persuasive.

*The traffic stop did not violate the Driving Equality Act, and even if it had, the stop still would have been constitutional*.  Bailey's first argument fails because the traffic stop did not in fact violate Philadelphia's Driving Equality Act.  This Act divides traffic violations under the Pennsylvania Vehicle Code into "primary violation[s]" and "secondary violation[s]."  Phila. Code § 12-1702.  Philadelphia police officers may not initiate a traffic stop for "secondary violations," which are past due emission and inspection stickers, late registrations, minor bumper damage, missing a single brake light or headlight, relocating a license plate (but the license plate must still be clearly displayed), and hanging items from the rear-view mirror.  *Id.* at § 12-

---

[11] Under 75 Pa. Cons. Stat. § 1332(a), "[e]very registration plate shall, at all times, be securely fastened to the vehicle to which it is assigned or on which its use is authorized in accordance with regulations promulgated by the department."  *Id.*  Here, Bailey had no valid registration plate on his minivan.  (Rough Hr'g. Tr. at 16:6–10.)  Thus, Bailey also violated 75 Pa. Cons. Stat. § 1332(a).

1702(2). All other violations of the Pennsylvania Vehicle Code count as "primary violations." *Id.* at § 12-1702(1). Here, Officer Momme observed that Bailey's car did not have a valid license plate. (Rough Hr'g. Tr. at 16:6–10.) Where the license plate should have been, Bailey's minivan had a custom-made, invalid paper tag. (*Id.*) Because Bailey's car had no "clearly displayed" license plate, this was a primary violation, and thus the traffic stop did not violate the Act. *See* Phila. Code § 12-1702(2)(c) (describing "display of registration plate" as a secondary violation only when "such plate is otherwise clearly displayed").

But even if the traffic stop had violated Philadelphia's Driving Equality Act, it still would have been constitutional. In *Whren v. United States*, the Supreme Court "held that police officers had acted reasonably in stopping a car, even though their action violated [local] regulations." *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (citing *Whren*, 517 U.S. at 815). The Court explained that Fourth Amendment protections cannot turn upon police enforcement practices— "even practices set by rule"—because police practices "vary from place to place and from time to time." *Moore*, 553 U.S. at 172; *Whren*, 517 U.S. at 815. Thus, the constitutionality of a traffic stop depends not on local regulations, but rather on the "officer's objective legal basis for the stop." *United States v. Johnson*, 63 F.3d 242, 247 (3d Cir. 1995). Here, Office Momme's objective legal basis for the stop is clear: he saw Bailey commit several traffic violations under Pennsylvania law.[12] (*See* Rough Hr'g. Tr. at 16:3–10.) Because "any technical violation of a traffic code legitimizes a stop," the traffic stop was lawful under the Fourth Amendment. *Mosley*, 454 F.3d at 252.

---

[12] The Driving Equality Act makes clear that drivers must still comply with the Pennsylvania Vehicle Code. *See* Phila. Code § 12-1703(1). Indeed, the Act states that it "shall not be construed to supersede any state or federal law." *Id.* at § 12-1704. Thus, Pennsylvania's Vehicle Code applies in full force in Philadelphia, and the Act merely reflects a change in local law enforcement practices.

*Officer Momme had jurisdiction to make the stop.* Bailey's second argument relies on a flawed premise to reach the wrong conclusion. He claims that the "Supreme Court has ruled that you do not need a driver's license, registration, or insurance to travel the roadways" unless you are using the roadways for commerce. (Doc. No. 59 at 1.) But Bailey provides no support to back up his bold claim. Instead, his argument rests on principles frequently rejected as "patently frivolous." *Ellis v. Philadelphia County*, No. 1:21-CV-298, 2022 WL 1491411, at *2 (W.D. Pa. Mar. 28, 2022) (collecting cases). Bailey then relies on this flawed premise to argue that because he was not engaged in commerce, Officer Momme had no "[j]urisdiction to conduct a traffic stop." (Doc. No. 73 at 1.) Not true. Bailey committed several traffic violations under Pennsylvania law while driving on public roads in Philadelphia. Officer Momme thus had jurisdiction to conduct a traffic stop.

### B.     The Car Search

Bailey next argues that the evidence recovered from his car must be suppressed because the search warrant lacked probable cause. When a defendant challenges a magistrate judge's probable-cause determination, "[t]he role of a reviewing court is not to decide probable cause *de novo,* but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts." *Id.* (cleaned up).

Here, the magistrate judge clearly had a "substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238–39 (alterations and internal quotations omitted). The affidavit in the search warrant application set forth several incriminating facts against Bailey. It explained that Officer Momme had pulled over a driver in a blue minivan with a paper tag,

8

reading "United States of America Republic Foreign National #UCC1308." (Doc. No. 94 at 12.) During the traffic stop, Officer Momme observed an AR 15 style gun on the passenger seat. (*Id.*) He then instructed the driver to turn off the vehicle, but the driver drove away instead. (*Id.*) The affidavit stated that Officer Momme later located the blue minivan with the same paper tag. (*Id.*) And, looking inside the vehicle, Officer Momme observed another firearm and a pistol magazine. (*Id.*) The minivan's vehicle identification number listed Andre Bailey as the last registered owner, and Officer Momme picked Bailey out of a photo array. (*Id.*) The affidavit last explained that Bailey had an active warrant out for his arrest. (*Id.*) Given these facts, the magistrate judge had much more than a substantial basis for concluding that "there [was] a fair probability that contraband or evidence of a crime will be found in" the blue minivan. *Stearn*, 597 F.3d at 554 (internal quotations omitted). Thus, Bailey's challenge to the search warrant fails.

        **C.**     ***The Buccal Swab***

Bailey last argues that the DNA evidence should be suppressed because his DNA was taken without his consent and allegedly by force. (Doc. No. 66 at 1; Rough Hr'g. Tr. at 93:4–14.) Neither ground is persuasive.

Under the Fourth Amendment, "a buccal swab on the inner tissue of a person's cheek in order to obtain DNA samples is a search." *Maryland v. King*, 569 U.S. 435, 446 (2013). Because a buccal swab counts as a search, the warrant requirement applies. *See Schmerber v. California*, 384 U.S. 757, 770 (1966) ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned.") Even if a search is done pursuant to a warrant, the "means and procedures employed in taking the [DNA] sample" must respect "relevant Fourth Amendment standards of

9

reasonableness." *United States v. Mathis*, No. CRIM. 09-339, 2012 WL 11036, at *2 (W.D. Pa. Jan. 3, 2012), *aff'd*, 568 F. App'x 149 (3d Cir. 2014) (internal quotations omitted).

Here, FBI agents obtained a search warrant to take a buccal swab of Bailey's inner cheek to get his DNA.[13] (Doc. No. 111 at 1.) Because the Government got a search warrant, it was not "required to obtain [his] consent . . . before executing that warrant." *Mathis*, 2012 WL 11036, at *3. Thus, Bailey's lack of consent to the buccal swab does not justify suppressing the DNA evidence.

Next, Bailey argues that the DNA evidence should be suppressed because his DNA was taken by force. (Doc. No. 66 at 1; Rough Hr'g. Tr. at 93:9–14.) More accurately, Bailey contends that he only complied with the swab because agents threatened to use force if he refused. (Doc. No. 66 at 1.) The Government counters that because no force was used, there was no Fourth Amendment violation. (Doc. No. 111 at 3.) At least one court has found that the mere fact "that [the Defendant] voluntarily complied with the execution of the warrant for Swab #3 due to a subjective fear of force does not mean his rights were violated." *Mathis*, 2012 WL 11036, at *3. So too here. Bailey's compliance with a valid search warrant due to his subjective fear that force would be used if he resisted does mean his constitutional rights were violated.

In any event, the agents were permitted to use reasonable force to take Bailey's DNA, pursuant to a lawful search warrant, if he had refused to voluntarily submit to a buccal swap. *See, e.g.*, *Brown v. Upper Darby Police Dep't,* No. 20-1452, 2021 WL 2948833, at *3 (3d Cir.

---

[13] Bailey has not challenged the validity of the warrant to take a sample of his DNA. But even if he had, such challenge would fail because there was clearly probable cause that Bailey's "genetic material would be linked to evidence from the crime." *United States v. Solomon,* Cr. No. 05–385, 2007 WL 927960, at *4 (W.D. Pa. Mar. 26, 2007) (internal quotations omitted). Law enforcement unearthed DNA evidence on the firearms recovered in Bailey's minivan. Given the minivan's registration record, Bailey's criminal history, and Officer Momme's identification of Bailey as the driver, there was probable cause that Bailey's genetic material would be linked to the unlawful firearms recovered in the search of his car.

July 14, 2021) (*per curiam*) (finding no Fourth Amendment violation when officers used force "to take a buccal swab, pursuant to a facially valid warrant," because "the force used was only what was necessary to obtain a sample despite Brown's active resistance"); *United States v. Bullock*, 71 F.3d 171, 176 (5th Cir. 1995) (ruling that "[t]he use of force in taking [blood and hair] samples" was reasonable because the defendant refused "to comply with a lawful warrant"); *United States v. Johnson*, 462 F.2d 423, 427 (3d Cir. 1972) ("[A] person does not have the right to forcibly resist execution of a search warrant by . . . a Government agent[.]"). These cases all demonstrate that officers can use reasonable force to overcome a defendant's resistance to a lawful search warrant. Such is this case here. FBI agents obtained a search warrant to take a buccal swab of Bailey's inner cheek. (Doc. No. 111 at 1.) If Bailey had resisted, agents could have used reasonable force to overcome his resistance and execute the search warrant. But because the agents ultimately did not have to use *any* force, the Court need not address the issue of unreasonable force under the Fourth Amendment. Thus, there is no basis to suppress the DNA evidence in this case.

### III. Conclusion

For the reasons above, the Court denies Bailey's motion to suppress. An appropriate order follows.